UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-80049-CR-MARRA/MATTHEWMAN

UNITED STATES OF AMERICA,

v.

SALOMON E. MELGEN,

        **Defendant.**

_____/

**MOTION FOR BOND PENDING APPEAL AND MOTION FOR NEW TRIAL**

Dr. Salomon Melgen, through his undersigned counsel, and pursuant to 18 U.S.C. § 3143(b), respectfully seeks bond pending appeal pursuant to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, in connection with the notice of appeal being filed later today. Dr. Melgen is not a flight risk, does not pose a danger to the safety of any person or the community, the appeal of his conviction is not for purpose of delay, and the appeal raises substantial questions of law and fact likely to result in reversal, an order for a new trial, and/or a reduced sentence. *See id.* 3143(b)(1).

In addition, pursuant to Federal Rule of Criminal Procedure 33, Dr. Melgen respectfully moves for a new trial in light of exculpatory evidence discovered after trial, which the prosecution also failed to disclose as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. These grounds for a new trial also support granting bond pending appeal.

**INTRODUCTION**

On January 29, 2013, the government executed a search of defendant's medical practice. From that point forward, Dr. Melgen was fully aware that he was the target of a two-pronged investigation by the Department of Justice ("DOJ"), which led to two prosecutions. The first

case was indicted on April 1, 2015 by DOJ's Public Integrity Section ("PIN") in the U.S. District Court for the District of New Jersey ("the New Jersey Case"). Ultimately, the trial judge in that case granted the defense's Rule 29 motion for acquittal on numerous counts, which led DOJ to dismiss the remainder of the case with prejudice. The second prosecution was this case, which was indicted on April 14, 2015.

Despite his awareness of DOJ's interest in him, at no point during five years of investigation and trials did Dr. Melgen ever show any intent to flee, despite countless opportunities to do so. Indeed, even after learning in early 2015 that DOJ would likely indict him, Dr. Melgen never made any effort to evade law enforcement. To the contrary, he traveled abroad with the intent to return for arraignment in New Jersey, and self-surrendered to the U.S. Marshals on his return from the Dominican Republic ("D.R.").

Before being remanded into custody, Dr. Melgen complied with all terms of release in both cases. He attended trial in this case and never exhibited any intent to flee. Most of Dr. Melgen's social ties are to Florida, and his family – including his wife, children, and grandchild – are in Florida. Further, Dr. Melgen has never shown an inclination to leave either before or during his criminal trial. An objective assessment of all statutory considerations demonstrates that Dr. Melgen should be granted bond pending appeal in this matter.

## ARGUMENT

**I.     THE COURT SHOULD GRANT BOND PENDING APPEAL.**

Under the Bail Reform Act, 18 U.S.C. § 3143(b)(1), bond pending appeal is appropriate (1) if the defendant is not a flight risk and poses no danger to the safety of any person or the community; (2) if the appeal is not for purpose of delay; and (3) if the appeal raises substantial questions of law or fact that, if "determined favorably to defendant on appeal," would likely lead to reversal (among other things). *U.S. v. Giancola*, 754 F.2d 898, 899-900 (11th Cir. 1985). A

"substantial question" is a "'close' question or one that very well could be decided the other way". *Id.* at 901.[1]

### A. Dr. Melgen Is Not A Flight Risk Or A Danger To The Safety Of Any Person Or The Community.

Notwithstanding his conviction and prison sentence, Dr. Melgen is not a flight risk. The most important factors for the Court's consideration are Dr. Melgen's personal history and characteristics, including his reliable court attendance; his family and community ties, including length of residence in the community; and his physical and mental condition.

Dr. Melgen has deep roots in this country and particularly in South Florida. Prior to his arrest, Dr. Melgen had practiced medicine since 1978, spending almost his entire career in the United States. He was a renowned retina specialist with four offices located in Palm Beach and St. Lucie Counties, Florida. Further, Dr. Melgen had been the ophthalmologist for numerous public figures including former Florida Governor Lawton Chiles.

Dr. Melgen's family ties to Florida are "the 'sort of family ties from which [the Court] can infer that [he] is so deeply committed and personally attached that he cannot be driven from it by the threat of a long prison sentence." *U.S. v. Stanford*, 630 F. Supp. 2d 751, 756 (S.D. Tex. 2009) (quoting *U.S. v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992)). Dr. Melgen is a U.S. citizen who made his home in the United States almost 40 years ago – and this country is now home to two more generations of his family.

---

[1] Importantly, although the statute says that the substantial questions of law or fact must be "likely to result in" reversal, among other things, *see* 18 U.S.C. § 3143(b)(1)(B), the granting of bond pending appeal does *not* require this Court to find "that its own rulings are likely to be reversed on appeal." *Giancola*, 754 F.2d at 900. Rather, the statute simply requires that if there is a substantial question, then "if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *Id.* at 901.

Dr. Melgen's conduct throughout the government's investigations and prosecutions is further compelling evidence of his lack of any intent to flee. Even before the indictments, when Dr. Melgen heard in November 2012 that false allegations were being made against him, he *called the FBI seeking help* and never made any effort to abscond. During that call, the FBI did not inform him that he was a target of any investigation. Yet several weeks later, on January 29, 2013, the FBI raided his medical practice and seized his files. Despite the raid, Dr. Melgen remained in West Palm Beach with his family, where he continued to practice medicine and care for his patients. The government continued to pay Dr. Melgen for treating his patients until his indictment in April 2015. Throughout this entire process, Dr. Melgen never took any action that reflected any intent to uproot himself. Post-indictment and during trial, Dr. Melgen was compliant with the all terms of his release.

Finally, Dr. Melgen is 63 years old, and before his conviction in this case had never been involved in any criminal matter. He has surrendered his medical license and has no intention to resume work in any capacity. The totality of the evidence about Dr. Melgen's personal and professional characteristics and behavior under indictment shows he poses no risk of flight.

**B.    Appeal Is Not For Purpose Of Delay And Raises Substantial Questions Of Law And Fact.**

A "substantial question" is "a 'close' question or one that very well could be decided the other way." *Giancola*, 754 F.2d at 901. In addition to appealing the Court's loss calculation and application of various sentencing enhancements, Dr. Melgen plans to raise numerous questions on appeal, including the following substantial issues, which warrant reversal outright:

(1)    The Court erroneously rejected the defense request to instruct the jury on the Supreme Court's definition of "materiality" in *Universal Health Services, Inc. v. Escobar*, 136 S. Ct. 1989 (2016) (the "materiality issue"). For criminal false or fraudulent claims and statements, as charged in the counts of conviction, the concept of "materiality" is critical, because the

4

        prosecution's own Medicare witnesses admitted on the stand that claims would still have been paid if they reflected a covered diagnosis from Dr. Melgen's paper files rather than the erroneously listed diagnosis of wet age-related macular degeneration ("AMD").

(2)    The prosecution's key evidence, which it emphasized during closing arguments, was inadmissible expert testimony offered under the guise of lay "peer comparison" summary evidence (the "peer comparison issue").

(3)    During jury deliberations, the Court gave to the jury 12 copies of the prosecution's unredacted "speaking" indictment. The indictment contained inadmissible allegations (1) that the "multi-dosing" administrative violation was a crime, despite the absence of any legal ruling to that effect, and despite Eleventh Circuit's prior refusal to reject Dr. Melgen's administrative interpretation (the "multi-dosing issue"); and (2) that Dr. Melgen stole approximately $100 million, notwithstanding the absence of any such evidence and the Court's finding at sentencing of a far lower loss amount (the "fraud amount issue");

(4)    The Court failed to adequately sanction the behavior by the prosecution's trial expert Dr. Bergen for his explicit intimidation of both defense experts (the "contempt issue"). The failure to grant the defense's request for an immediate contempt hearing prevented the defense from impeaching Dr. Bergen on these issues.

(5)    As outlined below in the motion for a new trial, *see infra* Section II.A and II.B, newly discovered evidence warrants a new trial, and this exculpatory evidence was also improperly withheld by the prosecution. First, it was not until sentencing that the prosecution disclosed the opinion of its trial rebuttal expert, Dr. Berger, that once a patient is receiving anti-VEGF injections, then – because the anti-VEGF medicine would control macular leakage – the evidence of disease may not be seen on fluorescein angiograms ("FAs"). Dr. Berger's opinion was materially exculpatory, because it undercuts the testimony by the prosecution's other trial experts who reviewed FAs, stated that they saw no leakage, and then used those FAs to criticize Dr. Melgen's diagnoses of those patients.

        Second, the prosecution failed to disclose evidence from the Centers for Medicare and Medicaid Services ("CMS") showing that a CMS attorney, Elizabeth Engel, agreed with Dr. Melgen that the multi-dosing regulations were complicated and unclear (the "Engel issue"). In fact, the prosecution refused altogether to treat CMS documents as covered by its *Brady* obligations, in disregard of precedent.

Each of these errors raises substantial questions for the Eleventh Circuit's review, both individually and when their cumulative effect is considered. Given the severity of the sentence

and likelihood of reversal if any of these substantial questions are decided favorably to Dr. Melgen, the defense requests bond pending appeal.

### 1. The materiality issue

The defense requested an instruction on "materiality" as an element of the charged offenses of healthcare fraud, false healthcare-related statements, and violations of the criminal False Claims Act. In relevant part, the first sentence of the proposed instruction was taken from the Circuit's model instruction O.53, and the remainder was adapted largely verbatim, including the crucial third sentence, from the Supreme Court's civil False Claims Act decision in *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002-04 (2016):

> A "material fact" is an important fact that a reasonable person would use to decide whether to do or not do something. A fact is "material" if it has a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. In other words, ***materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.*** . . .

(*See* D.E. 324-1 at 22, 25, 27 (emphasis added); *see also* D.E. 254 at 17-18.) The Court rejected this proposed definition of "materiality," instead giving the definition from the Circuit's Model Instruction O.53, even though it was drafted in April 2016, two months *before* the Supreme Court decided *Escobar*:

> A "material fact" is an important fact that a reasonable person would use to decide whether to do or not do something. A fact is "material" if it has the capacity or natural tendency to influence a person's decision. ***It doesn't matter whether the decision-maker actually relied on the statement or knew or should have known that the statement was false.***

(*See* D.E. 333 at 12 (emphasis added).)

At the charge conference, this Court rejected the defense proposal on the grounds that the evidence at trial did not support giving it. But *Escobar*'s definition of "materiality" did not turn on specific factual findings; it was a purely legal ruling that drew from common law, civil, and

6

criminal fraud precedent alike. *See* 136 S. Ct. at 1999-2000. Indeed, the Court clarified the universal applicability of its definition by noting that "[u]nder ***any understanding*** of the concept, materiality 'looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* at 2002 (emphasis added, brackets omitted; quoting 26 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 69:12 (4th ed. 2003)).

      The materiality issue was central to many of the counts of conviction. The prosecution's Medicare witness, Darlene Higginbotham, testified that certain treatments (such as Lucentis) could be appropriately paid even if the diagnosis on the claim form was incorrect, as long the patient had a disease for which the treatment was still appropriately billed. *See* Higginbotham 4/6/17 Tr. at 189:13-17 (explaining, in the case of one patient, S.B., that "Medicare would pay" if the paper medical record established "what the patient's condition was and it was a covered diagnosis," notwithstanding the fact that this diagnosis differed from the one submitted to Medicare). And indeed, some patients' medical files (such as S.B.'s) documented that they had a covered disease other than the wet AMD diagnosis that was submitted to Medicare. Thus, even looking at the specific evidentiary record, the *Escobar* instruction would have educated the jury that it could find that certain charged claims were not *materially* false, even if they incorrectly listed a diagnosis of wet AMD, given Ms. Higginbotham's testimony about Medicare's likely behavior when faced with a covered diagnosis in the paper record.

### 2. The prosecution's "peer comparison" evidence was inadmissible hearsay.

After no employee or patient of Dr. Melgen's testified to inculpate him in any wrongdoing, the prosecution returned to its "peer comparison" charts, introduced through FBI analysis Jennifer Minton, in an attempt to convict Dr. Melgen by asking the jury to compare him to prosecution-selected "peers." Having excluded the "peer comparison" evidence *before* trial, the Court reversed its decision near the close of the prosecution's case. Given the previously cited authority supporting Dr. Melgen's position,[2] and the Court's own willingness to entertain both sides of the question, the peer comparison issue is self-evidently "close" and "very well could be decided the other way." *Id.* at 901.

This issue alone will also likely result in reversal, as shown by the prosecution's emphasis on the peer comparison evidence throughout its closing argument. For each area of alleged false billing, the prosecution began its closing with the so-called peer comparison chart. Over and over again, the prosecution asked the jury to convict based on flawed and inadmissible statistics.

As explained in several motions (*e.g.*, D.E. 306, 343), the prosecution created the data contained in exhibits GX-3004 and GX-3004A and the summary charts in GX-10005 ("the Peer Comparison Evidence") by filtering and aggregating individual providers' daily claims data from raw Medicare data. Ultimately, the prosecution removed all providers except for the ones that they, the prosecutors, considered to be Dr. Melgen's "peers." The result was the data in exhibit GX-3004A. The prosecution-filtered data in GX-3004 and GX-3004A is hearsay and inadmissible under Federal Rule of Evidence 803(6). It is the prosecution's attempt to combine

---

[2] *E.g.*, Trial Tr. at 848, *United States v. Chhibber*, No. 11-CR-119 (N.D. Ill. Nov. 11, 2012) (ECF No. 251).

selectively culled data to paint a distorted picture of Dr. Melgen's "peers," against whom it asked the jury to compare his billing practices in order to find him guilty.

Under Eleventh Circuit precedent, the fact that the prosecution created GX-3004 and GX-3004A by modifying and combining raw claims data refutes the suggestion that these two exhibits were business records.[3]  Further, because Medicare does not cull data for litigation or comparison purposes as part of its regularly conducted business activity, GX-3004 and GX-3004A were inadmissible hearsay.[4]  Seeking to skirt this issue, the prosecution used an FBI analyst who was part of the prosecution team, Ms. Minton, to manipulate the data and advocate for the prosecution's position at trial, including by failing to remove duplicate and unpaid claims from the data, and by making superficial comparisons between Dr. Melgen and other doctors in their use of various testing regimens without any expert authority to support why those were the appropriate comparisons to make.  Repeatedly, the defense objected to the Peer Comparison Evidence, but the Court allowed its admission over objection.

In Dr. Melgen's objections, the defense relied on *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159-60 (11th Cir. 2004), which made clear that a party cannot use Rule 1006 (*i.e.*, the prosecution's basis for introducing this evidence) when the summary rests on "inadmissible hearsay and conclusory allegations."  It is undisputed that to create the peer comparison evidence, the prosecutors themselves selected the peer group criteria that Ms.

---

[3] *See U.S. v. Arias-Izquierdo*, 449 F.3d 1168, 1184 (11th Cir. 2006) (holding that trial court erroneously relied upon Rule 803(6) when admitting "a typed summary of handwritten business records" that was "prepared solely for trial," because the Rule "does not allow for the admission of such a summary"); *cf. U.S. v. Warner*, 638 F. Appx. 961, 964 (11th Cir. 2016) (finding no abuse of discretion in admitting spreadsheets where, although "[they] were formatted to be easier to understand and printed for litigation, the underlying records were kept in the ordinary course of business and the data was not modified or combined when entered into the spreadsheet").

[4] *See, e.g.*, *Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co., LLC*, No. 00-6410-CIV, 2003 WL 25666712, at *1 (S.D. Fla. May 19, 2003) (Marra, J.).  As noted above, GX-10005 did not summarize *unaltered* business records.

Minton then used to cull information on supposed peer physicians from Medicare. These criteria – the 500-injection and 2,000-patient thresholds – reflected the prosecutors' assumptions about who Dr. Melgen's peers were, for purposes of comparing their billing data against his. The resulting summary charts were highly misleading and prejudicial. The Court ultimately admitted the peer comparison evidence as summaries of Medicare data under Federal Rule of Evidence 1006. But any assumptions underlying Rule 1006 summaries must be based on evidence in the record, beyond the sponsoring witness's testimony. *See U.S. v. Richardson*, 233 F.3d 1285, 1294 (11th Cir. 2000). This did not happen.

The filters applied by the prosecutors to create the peer comparison charts in GX-10005 substantially prejudiced Dr. Melgen. There was no attempt to consider potential peers based on *where* they trained, *when* they trained, their public/private payor mix, their use of anti-VEGF drugs other than Lucentis, their training using dual therapy, their use of alternative testing, and many other potentially crucial factors. Had the prosecution properly sought to introduce the testimony of an expert in *medical statistics* to lay a proper foundation for the creation of peer comparison charts, the defense would have had an opportunity to cross-examine a knowledgeable expert on the culling decisions, as opposed to crossing Ms. Minton.

The peer comparison error was compounded by the prosecutors' use of comparative data to try to inaccurately corroborate expert testimony while undermining the defense's experts. The prosecution's charts – themselves introduced without expert testimony – left the jury "unduly impressed by the apparent authenticity of a government witness' chart computation, as such, rather than the truth and accuracy of the underlying facts and figures supporting them." *Gordon v. U.S.*, 438 F.2d 858, 876 (5th Cir. 1971). Criminal trial by prosecutor-manipulated data presented to the jury with the federal government's imprimatur, when such data is designed to

mislead and encourage conviction based on faulty comparisons, should not withstand appellate review.

### 3. Giving the jury 12 copies of the unredacted "speaking" indictment, which included statements unsupported by any evidence and erroneously portrayed multi-dosing as a crime, irrevocably tainted the jury.

The Court provided 12 copies of the unredacted "speaking" indictment to the jury during deliberation without renewing its instruction that the indictment was not evidence. By this very act, the indictment became the *de facto* guide for deliberations. The speaking indictment contained incorrectly allegations of law as well as factual allegations that were not introduced into evidence but merely designed to inflame the public. These allegations plainly contributed to conviction.

First, this Court gave each juror an indictment instructing them that Dr. Melgen's multi-dosing of Lucentis was part of a scheme to defraud healthcare, through "the submission of false claims for the purchase of Lucentis that substantially exceeded his actual cost" due to multi-dosing. (*See* Indict. ¶ 48.) But it is not a crime to multi-dose Lucentis or bill Medicare for multi-dosed Lucentis. ***No court*** has ever held that, and ***no court*** has ever held that Dr. Melgen's interpretation of the multi-dosing regulations was incorrect. This allegation was the subject of multiple motions *in limine*. (*E.g.*, D.E. 199.) Indeed, the Eleventh Circuit never decided the reasonableness of Dr. Melgen's own legal interpretation, and merely upheld Medicare's interpretation "***regardless of whether*** VRC proposes another reasonable interpretation of the [drug's] labeling." *Vitreo Retinal Consultants of the Palm Beaches, P.A. v. U.S. Department of Health & Human Services*, 649 F. App'x 684, 684 (11th Cir. 2016) (emphasis added). The jurors would never know that, because they were given 12 copies of a "speaking" indictment that said multi-dosing was part of a crime. By providing each juror with a copy of the indictment, the

Court enable the jury to erroneously convict Dr. Melgen on an invalid legal theory for any count involving a Medicare claim for Lucentis: that he committed healthcare fraud whenever he billed for a multi-dosed injection of the drug. This error cannot be undone and, standing alone, should lead to reversal.

Second, each juror's copy of the indictment stated, without evidence, that Dr. Melgen wrongfully took $100 million from Medicare. Paragraph 51 of the speaking indictment instructed the jurors that a "substantial portion" of over "$100 million" in Medicare payments to Dr. Melgen was the product of fraud. The prosecution never substantiated this allegation, and ultimately the Court rejected it at sentencing, finding the loss figure to be less than half that amount. It was prejudicially inflammatory to tell the jurors during deliberations, without any basis in fact, that Dr. Melgen stole over $100 million – and without giving them a renewed instruction that the indictment is not evidence.[5]

### 4. The Court's failure to inquire of or appropriately sanction Dr. Bergen for his intimidation of Dr. Melgen's witnesses merits reversal.

During breaks in the testimony of defense experts Dr. Michael Tolentino and Dr. Dana Deupree, prosecution expert Dr. Robert Bergen approached them both and made intimidating comments related directly to the substance of their testimony. Yet, despite the defense team's express requests during an *in camera* hearing, the Court declined to conduct any inquiry into

---

[5] *See U.S. v. Van Dyke*, 14 F.3d 415, 423 (8th Cir. 1994) ("Although there is ordinarily no error in giving the jury a copy of an indictment, in the complex context of this case we agree with appellant that the indictment, as the government's formal charging document, gave the jury a one-sided view of the case – especially in light of the fact that they did not have a set of neutral written jury instructions to guide them in their deliberations."); *cf. U.S. v. Haynes*, 573 F.2d 236, 242 (5th Cir. 1978) (no abuse of discretion in giving indictment to jury that "contain[ed] no inflammatory or perjorative language that would create any prejudice against the accused"); *Getchell v. U.S.*, 282 F. 2d 681, 689-90 (5th Cir. 1960) (reversing conviction on other grounds, but agreeing "that the long recital of the prosecution's theory of [mail] fraud contained in the indictment tended to prejudice the defendants").

12

whether Dr. Bergen should be held in contempt or attempted to obstruct justice. This inaction materially prejudiced Dr. Melgen.

For example, the chilling effect of Dr. Bergen's intimidation upon Dr. Tolentino's demeanor and willingness to vocalize his opinions cannot be undone. Dr. Tolentino's demeanor shifted from clear, confident, and assertive at the start of his testimony, and became hesitant after his encounter with Dr. Bergen. Factfinders routinely rely on witness demeanor when assessing credibility, and appeals courts routinely defer to such assessments.[6] A witness's credibility is especially critical in a trial like this one, where the trial's outcome turned on a battle of experts and the jury's credibility assessments of those experts. The Court made no formal inquiry into how Dr. Bergen's intimidation affected the testimony of Dr. Tolentino *was in the middle of giving.* Moreover, the Court's refusal to hold a contempt hearing deprived the defense of the potential ability to use a contempt finding to impeach Dr. Bergen.

Additionally, the Court's failure to hold a contempt hearing deprived the defense of the opportunity to ascertain the degree, if any, to which Dr. Bergen acted with the blessing or knowledge of the prosecution team. Governmental intimidation of a defense witness would violate the Due Process Clause and warrant reversal of a conviction and a new trial. *See, e.g.*, *U.S. v. Hammond*, 598 F.2d 1008, 1013 (5th Cir.), *modified on reh'g in irrelevant part*, 605 F.2d 862 (5th Cir. 1979), *abrogated as to analysis of harmless error, as recognized in U.S. v. Combs*, 555 F.3d 60, 64 n.3 (1st Cir. 2009). Throughout the trial, Dr. Bergen sat near and frequently

---

[6] *U.S. v. Clum*, 607 F. Appx. 922, 928 (11th Cir. 2015) ("Although the defendants, and other witnesses . . . testified consistently with their hypotheses of innocence, the jury seeing their demeanor and making credibility determinations was entitled to disbelieve them"); *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1167 (11th Cir. 2008) ("All three of these witnesses were cross-examined, and the jury had an opportunity to observe their demeanor and come to a conclusion about their credibility.").

13

socialized with one of the FBI case agents.[7]  Because no hearing was ever held, Dr. Melgen cannot know if he is entitled to a new trial on the grounds that this agent or another member of the prosecution team had a hand in Dr. Bergen's misconduct.  *See U.S. v. Schlei*, 122 F.3d 944, 993 (11th Cir. 1997) ("Because the record is insufficient to resolve the serious questions raised by [the defendant]'s claim of witness intimidation, we are compelled to vacate the denial of the motion for a new trial on the question of whether [the witness] was intimidated by the prosecutor.").

## II. A NEW TRIAL IS WARRANTED BECAUSE OF NEWLY DISCOVERED EVIDENCE, AND THESE ISSUES ALSO FURTHER WARRANT BOND PENDING APPEAL.

After the trial, two material pieces of new evidence came to the defense team's attention: one during sentencing in this case, and one during trial preparation in the New Jersey case.  Both of these pieces of evidence warrant a new trial here, as they constitute material evidence that is not merely cumulative or impeaching, and which is of such a nature that a new trial would probably produce a different result.  *See United States v. Lee*, 68 F.3d 1267 (11th Cir. 1995); *United States v. Thompson,* 422 F.3d 1285, 1294 (11th Cir. 2005).  Moreover, the prosecution's failure to disclose these pieces of evidence, despite being on notice of their material nature, rises to the level of a *Brady* violation.  Additionally, as noted above (*see supra* p. 5), these issues support bond pending appeal.

"Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, but may be probative of another issue of law."  *United States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013) (quotation marks omitted).  Before ruling on a motion for new trial on the basis of newly discovered evidence, the court should conduct an evidentiary hearing.

---

[7] The record reflects that this particular FBI agent previously failed to promptly notify prosecutors of information relevant to potential governmental misconduct affecting Dr. Melgen.

*United States v. Culliver,* 17 F.3d 349 (11th Cir. 1994). This is true regardless of whether the court is inclined to grant or deny the motion. *See id.*; *United States v. Gates*, 10 F.3d 765, 768 (11th Cir. 1993).

### A. The Berger Issue

During sentencing, the prosecution called Dr. Adam Berger, who had also testified during the prosecution's rebuttal case. During sentencing, Dr. Berger testified that once a patient is receiving anti-VEGF injections, then – because the anti-VEGF medicine would control the leakage – the evidence of disease may not be seen on FAs. Yet for several weeks during the trial, the prosecutors suggested precisely the opposite proposition, eliciting testimony from multiple physician witnesses that Dr. Melgen's FAs did not support his diagnoses of wet AMD and his administration of anti-VEGF injections. Standing alone, this new evidence plainly undercuts the prosecution's core strategy of using FAs to criticize Dr. Melgen's treatment plans.

Additionally, *Brady* imposes a duty on the prosecution to provide the defense with all evidence in its possession that is materially favorable to the defense. This duty includes turning over evidence that contradicts statements made by the government's witnesses. *Cf. Smith v. Cain,* 132 S. Ct. 627, 630 (2012) (finding *Brady* violation where prosecutors failed to disclose that trial witness's testimony was contradicted by other statements he made). Had the prosecution reported this information to the defense about the unsuitability of FAs to diagnose patients receiving anti-VEGF injections, it would have changed the course and outcome of the trial, by radically reshaping the cross-examinations of Drs. Fine, Haller, and Bergen.

This alone is yet another basis for reversal. But even without a *Brady* violation, Dr. Berger's new evidence during sentencing warrants an evidentiary hearing under Rule 33.

15

## B.     The Engel Issue

Before the trial in this case, the defense renewed a prior request for materials from the Centers for Medicare and Medicaid Services ("CMS") within the U.S. Department of Health of Human Services ("HHS"), the agency that administers Medicare – *i.e.*, the agency that was alleged to have been defrauded in this case. The prosecution thus necessarily consulted and coordinated with HHS and CMS as part of its trial preparation. *Brady* obligations attach to files in the possession of an agency, such as HHS or CMS, that was directly affected by or consulted in connection with the matters being prosecuted, especially when the prosecution uses that agency's other files as evidence. *See, e.g.*, *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973) (reversing corruption conviction and remanding for new trial, finding that trial court erred by excluding Post Office files from *Brady*'s scope: "It was a Post Office employee who had been sought to be bribed. The government cannot compartmentalize the Department of Justice and permit it to bring a charge affecting a government employee in the Post Office and use him as its principal witness, but deny having access to the Post Office files. . . . [T]here is no suggestion in *Brady* that different 'arms' of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities." (citation omitted));[8] *see also United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) (observing that information held by FDA can be imputed to prosecution, but finding no *Brady* violation because FDA lacked the requested information until after trial: "[I]f a government agency is charged with the administration of a statute and has consulted with the prosecution in the case, the agency will be considered part of

---

[8] After the former Fifth Circuit was reorganized into the modern Fifth and Eleventh Circuits, the Fifth Circuit overruled a separate holding of *Deutsch* related to entrapment defenses. *See United States v. Henry*, 749 F.2d 203, 206 n.2 (5th Cir. 1984). That overruling in *Henry* is irrelevant to the proposition discussed here; in any event, that overruling was itself subsequently abrogated by the Supreme Court. *See United States v. Jones*, 839 F.2d 1041, 1053 (5th Cir. 1988).

16

the prosecution, and its knowledge of *Brady* material will be imputed to the prosecution. The government cannot with its right hand say it has nothing while its left hand holds what is of value." (quotation marks and citations omitted)).

By letter dated November 22, 2016 (attached hereto as Exhibit A), undersigned counsel disputed the prosecution's prior position that Rule 16 and *Brady* did not obligate the prosecution to produce materials from CMS. That letter set forth the authorities noted above and others. The prosecution responded by letter dated January 25, 2017 (attached hereto as Exhibit B), repeating its position that it had no obligation to produce materials from CMS, but failing to address the binding *Deutsch* precedent (among others) noted above.

In September 2017, after the trial in this case, CMS contractor Darlene Higginbotham – who testified in this case in April 2017 – testified in the New Jersey case. During that New Jersey testimony (excerpts attached hereto as Exhibit C), Ms. Higginbotham revealed that around July 2009, she had discussions with a CMS attorney, Elizabeth Engel (Ex. C at 75:8-16); that Ms. Engel expressed her personal "difficulty understanding" the inconsistencies in the agency's payments policies for multi-dosed Lucentis and other multi-dosed drugs, "because it is a very complicated issue with multiple regulations" (*id.* at 50:6-9); and that Ms. Engel requested a "clarification" on multi-dosed Lucentis (*id.* at 76:20). The "clarification" that Ms. Engel requested became the July 22, 2009 "article clarification" admitted in this trial as GX-4057, during Ms. Higginbotham's April 5, 2017 testimony. *See* Higginbotham 4/5/17 Tr. at 212. Yet during Ms. Higginbotham's testimony in this case, she concealed the role that Ms. Engel's confusion and request played in the clarification's drafting, making no mention of Ms. Engel and instead testifying here that CMS's audit of Dr. Melgen was "what initiated the article." *See* Higginbotham 4/6/17 Tr. at 112 ("[MR. OGROSKY:] And, by the way, I think you said

17

yesterday that when First Coast learned of Dr. Melgen's multi-dosing, it put out to the public as part of its announcement a notice saying if you think you've done this, repay the overpayment. A: Yes.  Q: Do you remember that?  A: Uh-huh.  Q: And you said it was just about Dr. Melgen. A: That's what initiated the article.").

Ms. Engel's concerns about Medicare's inconsistent refusal to pay for multi-dosed Lucentis thus reinforced Dr. Melgen's position throughout the entire trial in this case: that the rules surrounding were complicating and unclear, that his legal interpretation was reasonable, and that he harbored no improper motive in multi-dosing Lucentis.  Had the prosecution heeded binding precedent and reviewed CMS's records for materials directly citing Dr. Melgen's name, it would have found relevant emails and other documents and produced them as *Brady* in this case.  Indeed, Dr. Melgen's preparation for trial in the New Jersey case uncovered at least one such email chain between Ms. Engel and CMS officials that memorialized her view that Medicare's payment policies for multi-dosed Lucentis and other multi-dosed drugs were inconsistent.

The prosecution's failure to conduct the required search improperly deprived the defense of the ability to legitimize Dr. Melgen's position on multi-dosing, using evidence – and potentially testimony – from the allegedly defrauded agency's own official, Ms. Engel.  Given the prosecution's emphasis on multi-dosing throughout the trial, and the associated allegations in the speaking indictment that each juror was improperly provided (*see supra* Section I.B.3), this new evidence plainly undercuts the prosecution's portrayal of Dr. Melgen's reasons for multi-dosing.  This in turn is "probative of another issue of law," *Scrushy*, 721 F.3d at 1304, namely whether Dr. Melgen's acted willfully when diagnosing patients with wet AMD and then treating

them with multi-dosed Lucentis. This too is yet another basis for reversal. But even without a *Brady* violation, Ms. Engel's evidence warrants an evidentiary hearing under Rule 33.

## CONCLUSION

For the reasons set forth above, Dr. Melgen respectfully requests that the Court grant a new trial and/or bond pending appeal.

Respectfully submitted,

/s/Matthew Menchel

| | |
|---|---|
| Matthew I. Menchel, Bar. No. 12043 | Kirk Ogrosky (*pro hac vice*) |
| Samuel A. Stern, Bar No. 51602 | Murad Hussain (*pro hac vice*) |
| KOBRE & KIM LLP | ARNOLD & PORTER KAYE SCHOLER LLP |
| 2 South Biscayne Boulevard, 35th Floor | 601 Massachusetts Avenue, N.W. |
| Miami, FL 33131 | Washington, D.C. 20001 |
| (305) 967-6108 (tel) | (202) 942-5330 (tel) |
| (305) 976-6128 (fax) | (202) 942-5999 (fax) |
| Matthew.Menchel@kobrekim.com | Kirk.Ogrosky@arnoldporter.com |
| Samuel.Stern@kobrekim.com | Murad.Hussain@arnoldporter.com |

*Counsel for Defendant Salomon E. Melgen, M.D.*

March 8, 2018

## CERTIFICATE OF SERVICE

I hereby certify that, on March 8, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for all parties.

                                   /s/ Matthew I. Menchel
                                   **KOBRE & KIM LLP**